

# United States District Court
## Middle District of Florida
### Orlando Division

**GAYLYN PHARR,**

Plaintiff,

-vs-                                                    Case No. **6:03-cv-735-Orl-22KRS**

**CONTINENTAL CASUALTY COMPANY,**

Defendant.

_____/

# O R D E R

## I. INTRODUCTION

Pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.,* Plaintiff Gaylyn Pharr sues Defendant Continental Casualty Company ("CNA") to recover benefits under an employer-provided long-term disability ("LTD") plan administered and funded by CNA. The parties have filed cross-motions for summary judgment. Upon carefully considering the motions, legal memoranda, statements of undisputed material fact and responses thereto, supporting and opposing evidentiary materials, and related submissions, the Court determines that the Plaintiff is entitled to summary judgment.

## II. BACKGROUND

Gaylyn Pharr was employed as Vice President/Associate Media Director in the Dallas, Texas office of an advertising business known as The Martin Agency ("TMA"). January 15, 1999 was the last day she worked at TMA.



Pharr was an eligible participant in TMA's LTD plan issued by CNA. The plan contains

the following disability definition applicable to employees of Pharr's class:[1]

> "Total Disability" means that, during the Elimination Period[2] and
> the Insured Employee Occupation Period[3] shown in Statement 4
> of the Application, the Insured Employee, because of injury[4] or
> sickness,[5] is:
>
> > (1)    continuously unable to perform the
> > substantial and material duties of his regular
> > occupation;
> > (2)    under the regular care of a licensed
> > physician other than himself; and
> > (3)    not gainfully employed in any occupation
> > for which he is or becomes qualified by
> > education, training or experience.

CNA0665 (footnotes added).[6]

---

[1]As an active, full-time corporate officer of TMA, Pharr was a Class I employee. CNA0661. Record citations preceded by "CNA" (e.g., "CNA0001") refer to documents attached as exhibits to CNA's Motion for Summary Judgment (Doc. 26).

[2]The Elimination Period is 90 days. CNA0660.

[3]The Occupation Period applicable to Pharr lasts until her 65th birthday. CNA0655 & 0660.

[4]"'Injury' means bodily injury caused by an accident which results, directly and independently of all other causes, in loss which begins while the Insured Employee's coverage is in force." CNA0665.

[5]"'Sickness' means sickness or disease causing loss which begins while the Insured Employee's coverage is in force." CNA0665.

[6]The foregoing definitions of "Total Disability," "Elimination Period," "Occupation Period," "injury" and "sickness" are derived from the 1993 version of the policy. Although the 1999 version contains a different definition of disability, *see* CNA0008, the parties have stipulated in their Joint Pretrial Statement to the definition contained in the 1993 version. Doc. 39, § VI ("Stipulated Facts"), ¶ 4, at 5. Additionally, in its summary judgment motion, CNA admits that the 1993 policy's definition of disability applies. Doc. 26 at 3-4 n.2.

On March 11, 1999, Pharr presented her LTD claim to CNA. The initial paperwork, consisting of an "Employee's Statement, Physician's Statement, and Employer's Statement," as well as a job description and a "To Whom It May Concern" letter authored by Dr. Paul R. Cheney, was submitted on Pharr's behalf by TMA. CNA0643-652.

The Physician's Statement was signed by Dr. Cheney on February 24, 1999. Dr. Cheney listed his speciality as Internal Medicine. CNA0651. He reported a diagnosis of Chronic Fatigue Syndrome ("CFS"). CNA0650. He listed the following physical limitations: no lifting greater than 10 pounds, no standing longer than 30 minutes, no stooping, and "reduced physical stress." CNA0651. In the section of the form requesting "PROGNOSIS (Recovery and return to work date)," Dr. Cheney wrote: "Possible within next 12 months[,] but not probable." *Id.*

In his separate letter dated December 16, 1998 (the date of Pharr's last visit), Dr. Cheney stated, in pertinent part:

> At the time of her visit, Ms. Pharr met the CDC case definition for Chronic Fatigue Syndrome including both major criteria and seven out of eight minor symptom criteria. Her SF-36 short form shows a PCS score of 12, which indicates a significant level of physical impairment, but a normal emotional score of 42.
>
> After a thorough evaluation and discussion, I recommended that Ms. Pharr consider taking a medical leave of absence for approximately one year during which time she would focus on an integrative step-wise therapeutic approach outlined in December. At the end of one year, Ms. Pharr will be reevaluated for possible return to work.

CNA0652.

On April 1, 1999, TMA sent CNA a letter addressing "the physical aspects of Ms.

Pharr's job and possible modifications in the job." CNA0642. In pertinent part, the letter

stated:

> As Associate Media Director and manager of our Dallas office,
> Ms. Pharr was in charge of the entire media planning and buying
> operation for one of our largest accounts - a $60 million dollar
> financial services account with operations and advertising needs
> covering 12 states. Because of the retail nature of the client's
> business, media plans for placement of newspaper, radio, and
> television ads often have to be developed and revised on very
> short notice and with immediate deadlines, making this a "high
> stress" account.
>
> Ms. Pharr managed a staff of six people in Dallas as well as
> working directly with the account management team here in
> Richmond and the client in Columbus, Ohio. She normally spent
> about 30% of her time traveling to Richmond, Columbus, and
> the various market areas. The job requires a minimum of 9 hours
> per day on average. The demands of the job reflect the nature
> and requirements of the client, so we do not feel that the job
> could be modified by reducing hours or travel requirements.
>
> Unfortunately, The Martin Agency has now resigned from this
> account. Since the Dallas office was maintained solely to service
> that client, we have closed that office and laid off the entire staff
> effective March 31, 1999.

CNA0642.

Thereafter, CNA began collecting medical records from Pharr's treating physicians.

Pharr herself also submitted medical records to CNA. From those records, the following picture

emerges: In March 1998, Pharr contracted what she believed was a bad case of the flu. She was

initially treated by an internist, Dr. Cheatham. However, after her symptoms persisted, Pharr

was seen during the period April-November 1998 by an infectious disease specialist (Dr.

Haron), a gastroenterologist (Dr. Stevens), a rheumatologist (Dr. Zashin), and another internist with expertise in CFS (Dr. Zeller). In connection with her examination by these physicians, Pharr underwent a host of diagnostic tests and procedures (e.g., chest x-rays, stool tests, abdominal and pelvic sonogram, blood work, abdominal and pelvic CT scan, colonoscopy, and esophagogastroduodenoscopy). These tests failed to definitively disclose the cause of Pharr's symptoms, which included fever, fatigue, cognitive difficulties, abdominal discomfort, gastrointestinal problems, and pain in her joints and muscles.

In July 1998, Dr. Shosid, a psychiatrist, re-evaluated Pharr.[7] After Pharr's visit, Dr. Shosid stated, in pertinent part:

> At the current time I do not feel that Gaylyn is suffering from depressive symptoms. Her mood disorder appears to be well controlled on her current dose of Zoloft and I am not recommending any medication changes. I do not feel that the physical complaints she is experiencing (i.e., fatigue) are secondary to depression.

CNA0416.

In August 1998, Pharr's rheumatologist, Dr. Zashin, noted that he suspected Pharr was suffering from "a post viral chronic fatigue type syndrome." CNA0128. That same month, internist Dr. Zeller expressed the "impression" that Pharr was suffering from "chronic fatigue, post flu-like syndrome." CNA0523. Finally, in December 1998, Dr. Cheney, a specialist in CFS, definitively diagnosed Pharr as having CFS.

---

[7]Dr. Shosid had treated Pharr for about nine months in 1995 following a diagnosis of major depressive disorder. Prior to the re-evaluation visit, Dr. Shosid had last seen Pharr in October 1995, at which time Pharr was doing well on a prescribed dosage of Zoloft. Thereafter, Pharr's general practitioner continued Pharr's Zoloft prescription.

After collecting Pharr's medical records, CNA had them reviewed by its medical consultant, Dr. Eugene Truchelut, an internist  On May 13, 1999, Dr. Truchelut issued a report concerning his review.  At the outset, Dr. Truchelut expressed the view that the job description furnished by Pharr's employer "indicates that [Pharr's] position there as Associate Media Director would probably fall into the sedentary and possibly light classification."  CNA0064. Dr. Truchelut then surveyed Pharr's medical records.  After doing so, he referenced "a detailed Statement of Daily Activities filled out by the claimant on 4/2/99," in which Pharr "describes 'good days and bad days' but at least part of the time cooks meals, does her own laundry, handles her own money and pays bills, shops for groceries, drives a car, and exercises, mostly with Yoga."  CNA0067.  Dr. Truchelut concluded his report by stating:

> Based on all of the above information, including the current ADL's,[8] there is no objective medical evidence to support a severely restricted functional status such that [Pharr] could not perform sedentary or light work activities.  She admittedly is doing some of these things now with her ADL's.  Her extensive work up has been essentially negative, including her repeated physical examinations which were fairly benign.  She alleged cognitive problems at one point in the history, but there is no record of detailed neuropsych testing having been performed to evaluate this.  Her reported fever of early February 1999 was felt to be likely a (acute) viral infection by Dr. Zashin.  The records from her treating physicians in Texas do not really comment regarding a disability impression, and I noted that she worked until 1/99 despite reports of her various chronic symptoms. There is no documentation of chronic fever, weight loss or wasting from any of these treatment records.  A diagnosis of chronic fatigue syndrome based on the CDC definition notwithstanding, there is no clear objective information here to support a severely reduced functional capacity in early 1999.

---

[8]Apparently, "ADL" is an acronym for "Activities of Daily Living."

CNA0067 (footnote added).

On June 1, 1999, CNA sent Pharr a letter notifying her that it was denying her LTD

benefits claim on the asserted basis that she was "not totally disabled from [her] occupation as

Vice President Associate Media Director[.]" CNA0059. More particularly, the letter stated:

"The medical information contained in your file does not substantiate that you have a physical

impairment that precludes you from performing the substantial duties of your occupation beyond

the full 90-day Elimination Period. Therefore, you do not qualify for benefits and your claim

is denied." *Id.* CNA then summarized Pharr's medical records and reiterated that it was

denying Pharr's claim, stating: "Based on all of the above information, plus the ADL which you

completed on 4/2/99, there is no objective medical evidence to support a condition with the

severity to prevent you from doing the material and substantial duties of your own occupation."

CNA0061.

On July 12, 1999, Pharr underwent a cardiopulmonary exercise stress test ("Bicycle

Ergometry With Gas Analysis") at Dr. Cheney's clinic. CNA0471. According to Dr. Cheney's

report concerning the procedure, "[b]y measuring expired gases at rest, anaerobic threshold and

peak exercise, this test procedure can provide objective evidence of metabolic defects which

limit the functional capacity of persons suffering from chronic fatigue syndrome." *Id.* (footnote

omitted). After describing the results of the test, Dr. Cheney's report concludes by stating:

> Taken together these abnormalities suggest a significant
> impairment of work capacity which cannot be explained merely
> on the basis of deconditioning. Also, the defects seen [in] her
> neuroendocrine responses point to significant functional
> problems originating within the central nervous system. These
> findings are comparable with the observations of other

> investigators and are likely to cause severe functional capacity
> difficulties for Ms. Pharr.

CNA0472.[9]

Following CNA's initial claim denial, Pharr retained counsel and appealed the insurer's

decision. *See* CNA0056-57. Pharr then sent CNA additional medical records. CNA forwarded

those documents to Dr. Truchelut for further review. On November 9, 1999, Dr. Truchelut

prepared a report concerning these additional submissions. *See* CNA0054.

The new documents included a February 16, 1999 report prepared by Dr. Cheney, the

CFS specialist, concerning a follow-up telephone consultation with Pharr. Dr. Truchelut

described this document as follows:

> In this [Dr. Cheney] notes that the claimant has been through a
> number of major psychological stressors and had some nausea
> symptoms associated with the use of her supplements. These
> include Betaine, Magnesium, Antioxidants, and vitamin B12.
> The claimant was complaining of the same types of symptoms
> including cognitive problems, abdominal pain, fatigue, and low
> back pain. Dr. Cheney describes laboratory findings of
> glutathione deficiency, essential fatty acid depletion (omega-3
> and omega-6), significant mineral depletions from hair analysis,
> and "blood microscopy analysis showing black fungus, Candida

---

[9]Concerning this report, Pharr's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment states: "A Bicycle Ergometry with Gas Analysis Test that [CNA] received before denying the Plaintiff's benefits revealed 'a significant impairment of work capacity which cannot be explained merely on the basis of deconditioning['] that 'are likely to cause severe functional capacity difficulties for Ms. Pharr.'" Doc. 24. ¶ 12, at 3 (footnote omitted). CNA's Response to Plaintiff's Statement of Undisputed Material Facts contains the following response to the foregoing statement of fact: "The operative words in that report are 'likely to cause,' as opposed to 'have caused.'" Doc. 29, ¶ 12, at 3. Hence, CNA does not dispute that it received Dr. Cheney's bicycle ergometry test report before denying Pharr's claim. In her legal memorandum supporting her summary judgment motion, Pharr states that CNA received this report "during the appeals process and right before Defendant's final determination of its denial of Ms. Pharr's benefits[.]" Doc. 25 at 4.

> species, complex aggregates, and parasites." His impression was
> "chronic fatigue syndrome with a prominent dysbiotic bowel by
> organic testing and video microscopy." He instituted the use of
> some additional supplements including garlic, MSM,
> glucosamine, SAM-E, and fish oil.

CNA0054.

Additionally, Dr. Truchelut reviewed a report prepared by a neurologist, Dr. Stewart, on

October 5, 1998. Dr. Stewart performed a neurological evaluation of Pharr based on her

complaints of headaches, memory loss, and dizziness. Dr. Stewart's "impression" was

"Probably basilar artery migraine of the posterior circulation due to the intermittent nature of

this problem." CNA0408. Dr. Stewart recommended, *inter alia*, that Pharr undergo an MRI

scan of the head. Dr. Truchelut noted that an MRI was done, that it was "read as entirely

normal," and there did not appear to be any follow-up records from Dr. Stewart. CNA0054.

Following his discussion of these additional records, Dr. Truchelut concluded his report

by stating:

> With regards to the above additional records submitted for
> review, I do not see any new information which would change
> my impression from the prior review. Please refer to the last
> paragraph of that report. In particular the detailed examination
> by Dr. Stewart does not describe findings which would be
> consistent with a severely reduced physical capacity. If indeed
> the claimant has an established diagnosis of basilar artery
> migraine, she would likely be restricted from any hazardous
> work place environments.

*Id.*

On November 16, 1999, CNA sent Pharr's lawyer a letter notifying him that the company had reviewed the additional submissions, but that it was not changing its previous decision. *See* CNA0052. The letter briefly discussed Dr. Stewart's neurological report and the normal MRI, then stated: "The remainder of the information submitted 11/1/99, along with what we previously reviewed, does not describe findings that would be consistent with a severely reduced physical capacity. Therefore, we must again deny the claim." *Id.* The letter closed by stating that Pharr's claim had been referred to the company's Appeals Committee for consideration.

On January 31, 2000, a member of CNA's Appeals Committee sent Pharr's counsel a letter affirming the insurer's decision denying benefits. CNA0048. In pertinent part, the letter stated:

> Ms. Pharr's last day worked for [T]he Martin Agency as a Vice President/Associate Media Director was recorded as January 15, 1999. Her medical condition was described as Fibromyalgia and total disability from this condition was originally certified by Dr. Cheney on February 24, 1999. Ms. Pharr's Elimination Period started on her Date of Loss which was January 18, 1999 and would extend through April 18, 1999.
>
> In order to satisfy the 90 [sic] Elimination Period, Ms. Pharr's medical records would have had to reflect a decrease in her overall functionality to such a degree that it would continuously preclude her from performing the substantial duties of her job. The medial [sic] records offered to CNA for review did not reflect such a degree of decreased functionality particularly during her Elimination Period. Therefore, without meeting this policy provision, benefits are not payable. A detailed outline and comprehensive assessment of these medical records have been mailed to you in the above mentioned letters.

It is important to know that medical evidence of disability means medial [sic] signs and findings established by medically acceptable diagnostic techniques which show a medical impairment resulting from abnormalities which could reasonably be expected to produce the pain or other symptoms that are reported by an individual. Subjective complaints or self-reported symptoms alone are not considered conclusive evidence of disability. Further, if medical evidence and/or reported activities of daily living reflect a physical capability that is equal to or greater than that which is required to perform the substantial duties of an occupation, then the definition of disability would be rendered not met.

To conclude, our position with regard to your Client's claim is that there are no findings of severe anatomical, physiological or psychological abnormalities as a results [sic] of her Fibromyalgia which would reasonably be considered continuously disabling thereby preventing a return to the substantial duties of her occupation. This position also coincides with an Independent Physician Review which was completed, at CNA's expense, on Ms. Pharr's file prior to the Appeals review.

CNA0049.

This lawsuit ensued.

### III. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The party seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U. S. Steel &*

*Carnegie*, 17 F.3d 1386, 1396, *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994), *cert. denied*, 513 U.S. 1110 (1995)). "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349. The Court considers the evidence and all inferences drawn therefrom in the light most favorable to the non-moving party. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993), *reh'g and reh'g en banc denied,* 16 F.3d 1233 (11th Cir. 1994).

## IV. ERISA STANDARD OF REVIEW

### A. Generally

The Supreme Court has held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B)[10] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (footnote added); *Kirwan v. Marriott Corp.*, 10 F.3d 784, 788 (11th Cir. 1994) (quoting *Bruch*). Expanding on this principle, the Court of Appeals for the Eleventh Circuit stated in *Kirwan*:

> This circuit has interpreted *Bruch* to mandate *de novo* review unless the plan *expressly* provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms. Thus, this court has applied the arbitrary and capricious standard when the plan provides that the

---

[10]Section 1132(a)(1)(B) authorizes a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"

> administrator[']s "determinations shall be final and conclusive"
> so long as they are "reasonable determinations which are not
> arbitrary and capricious."   This court has also applied the
> arbitrary and capricious standard when the plan confers upon the
> administrator "full and exclusive authority to determine all
> questions of coverage and eligibility" and "full power to construe
> the provision[s]" of the plan.   On the other hand, this court has
> applied the *de novo* standard when the plan confers upon the
> administrator the authority to make initial eligibility
> determinations "according to the terms of the Plan."

10 F.3d at 788 (emphasis in original; footnotes and internal quotation marks omitted).

If the *de novo* standard applies, a district court reviewing a benefits determination "is not limited to the facts available to the Administrator at the time of the determination." *Kirwan*, 10 F.3d at 789.   On the other hand, if the arbitrary and capricious standard applies, "the administrator's fact-based determinations will not be disturbed if reasonable based on the information known to the administrator at the time the decision was rendered." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997).   The arbitrary and capricious standard applies to the administrator's "construction of the plan and concomitant factual findings[.]" *Id.* However, if an administrator who has been granted discretion under the plan has a conflict of interest, a "heightened" arbitrary and capricious standard governs. *Id.* at 1449. Such a conflict of interest exists where a plan is administered by an insurance company which pays benefits out of its own assets. *See, e.g., Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1561-68 (11th Cir. 1990), *cert. denied,* 498 U.S. 1040 (1991).   Under this heightened arbitrary and capricious standard,

> "a wrong but apparently reasonable interpretation is arbitrary and
> capricious if it advances the conflicting interest of the fiduciary
> at the expense of the affected beneficiary or beneficiaries unless

the fiduciary justifies the interpretation on the ground of its
benefit to the class of all participants and beneficiaries."

*Godfrey v. BellSouth Telecomms., Inc.,* 89 F.3d 755, 758 (11th Cir. 1996) (quoting *Brown*, 898

F.2d at 1566-67).  This principle is limited by an important precondition: "'[t]he fiduciary's

interpretation first must be "wrong" from the perspective of a *de novo* review[.]'" *Godfrey*, 89

F.3d at 758 (quoting *Brown*, 898 F.2d at 1566 n.12).

## B. Application to the Instant Policy

When Pharr submitted her claim for LTD benefits, the 1993 version of policy SR-

83086814 was in effect.  However, by the time CNA finally denied Pharr's claim, the 1999

version of the policy had become effective.  The 1993 policy does not contain any grant of

discretionary authority.  In contrast, the Group Long Term Disability Certificate contained in

the 1999 version of the policy states, in pertinent part: "When making a benefit determination

under the policy, *We*[11] have discretionary authority to determine *Your* eligibility for benefits and

to interpret the terms and provisions of the policy."  CNA0006 & 0022 (footnote added;

emphasis in original).  At least three courts have determined that this particular language is

sufficient to invoke the arbitrary and capricious standard. *See Wadford v. Continental Cas. Co.,*

261 F. Supp. 2d 402, 409-10 (W.D. N.C. 2003); *Sanderson v. Continental Cas. Corp.,* 279 F.

---

[11]Under the 1999 version of the policy, "we", "our" and "us" refers to CNA.  CNA0019 &
0037.  "You", "your" and "yours" "means the employee to whom this certificate is issued and whose
insurance is in force under the terms of the policy." *Id.*

Supp. 2d 466, 472-73, *reconsid. denied,* 2003 WL 22078075 (D. Del. 2003); *Thorpe v. Continental Cas. Co.,* 2002 WL 31845876 *2-3 (E.D. Pa. 2002).[12]

The parties disagree about which version of the policy controls regarding the standard of review. Pharr contends the 1993 version applies because that was the policy in effect when she filed her LTD benefits claim. CNA counters that the 1999 version controls because it was in effect when the company denied Pharr's claim, and ERISA claims do not accrue until an application for benefits is denied.

Neither side has cited Eleventh Circuit authority directly on point. However, this Circuit's precedent makes clear that "[u]nlike pension benefits, welfare benefit plans neither vest nor accrue." *Owens v. Storehouse, Inc.,* 984 F.2d 394, 397-98 (11th Cir. 1993).[13] Consequently, employers are "free to create, modify, or terminate the terms and conditions of employee welfare benefit plans as inflation, changes in medical practice and technology, and the cost of treatment dictate." *Owens,* 984 F.2d at 398. Based on this reasoning, the Eleventh Circuit held in *Owens* that where an employer reserved the right to change or terminate its ERISA health benefit plan, it could properly reduce benefits for a particular illness even after its employee became ill and submitted claims. *Id.* at 396-98.

_____

[12]In all three of these cases, it was further determined that the "heightened" or "modified" version of arbitrary and capricious review applied because the insurer was operating under a conflict of interest.

[13]Of course, "an employer may contractually bind itself" to provide benefits. *Owens,* 984 F.2d at 398.

Moreover, *Shaw v. Connecticut Gen. Lif. Ins. Co.,* 353 F.3d 1276, 1282-84 (11th Cir.

2003), *reh'g & reh'g en banc denied,* - F.3d - (11th Cir. 2004) (Table, No. 02-15525), suggests

that a modification granting discretionary authority that comports with an ERISA plan's

amendment procedures is valid. In that regard, *Shaw* states:

> Having created a particular procedure, it seems evident to us that
> the parties to the agreement must follow that procedure in order
> to create enforceable amendments to their contract. . . . If the
> employer and the insurance company wish to include a term as
> critical as a grant of discretionary authority to the plan
> administrator, then they can be expected either to write that term
> into the underlying contract or amend the contract according to
> their own, expressly agreed-upon procedures.

353 F.3d at 1283.

In *Shaw*, the underlying policy required both the insurer and the employer to sign off on

amendments. *Id.*[14] There was no evidence in the record demonstrating that this had occurred.

*Id.* at 1284. Accordingly, the appellate court held that the purported amendment was invalid.

*Id.* at 1283.

In *Grosz-Saloman v. Paul Revere Life Ins. Co.,* 237 F.3d 1154 (9th Cir. 2001), the Ninth

Circuit addressed the same question at issue in the present case: "which policy dictates the

standard of review when an insured files her claim under a non-discretionary policy but is

subsequently denied benefits under an amended regime." 237 F.3d at 1159. *Grosz-Saloman*

---

[14]Specifically, the policy in *Shaw* provided: "No change in this contract will be valid unless approved by the Insurance Company and evidenced by endorsement on this contract or by amendments to this contract signed by the Employer and by the Insurance Company, acting through its President, Vice President, Secretary or Assistant Secretary." 353 F.3d at 1283. The *Shaw* court stated: "This amendment procedure satisfies the requirements of the ERISA statute and its regulations." *Id.*

-16-

cited the Eleventh Circuit's *Owens* decision for the proposition that ERISA welfare benefits (unlike pension benefits) need never vest. 237 F.3d at 1160 & n.17. Accordingly, the appellate court stated, "[a]n employer . . . may unilaterally modify or terminate welfare benefits, unless it contractually agrees to grant vested benefits" *Id.* at 1160 (quoting *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1510 (10th Cir. 1996)). However, as in *Shaw*, *Grosz-Saloman* held that the change at issue in that case was invalid because the policy's amendment procedure had not been followed. 237 F.3d at 1161-62.

In contrast to *Shaw* and *Grosz-Saloman*, here it appears that CNA complied with the amendment procedures contained in the 1993 version of policy SR-83086814 when it replaced the earlier policy with the 1999 version. Pharr does not contend otherwise. Concerning amendments, the 1993 version states: "No change in this policy is valid unless approved in writing on this policy by one of Our[15] officers. No agent has the right to change this policy or to waive any of its provisions." CNA0669 (footnote added).[16] In compliance with this provision, the first page of the 1999 version of the policy bears the signatures of CNA's Chairman of the Board and its Secretary. CNA0001. Hence, this amendment appears to comply with the 1993 policy's modification procedures. Accordingly, "pure" arbitrary and capricious standard of review applies, unless CNA had a conflict of interest mandating application of the heightened version of that standard. The Court determines that a conflict of interest did exist,

---

[15]Under the 1993 version of the policy, "we", "our" and "us" refers to CNA. CNA0664.

[16]Based on *Shaw*, 353 F.3d at 1283, this language in the 1993 policy constitutes a valid amendment procedure.

since the parties have stipulated in their Joint Pretrial Statement that CNA both insured and administered the plan.  *See* Doc. 39, § VI ("Stipulated Facts"), ¶ 2, at 5.   Under these circumstances, heightened arbitrary and capricious review applies.  *See Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1561-68 (11th Cir. 1990), *cert. denied,* 498 U.S. 1040 (1991).

## V.  CNA's BENEFIT DENIAL DECISION

### A.  From the Perspective of De Novo Review, Was Pharr Totally Disabled?

As a matter of law, the answer to this question is "yes."  In other words, a reasonable fact-finder could reach no conclusion other than that, during the elimination period and beyond, Pharr was totally disabled (i.e., that she was unable to perform the material and substantial duties of her regular occupation) because of CFS.

Pharr was diagnosed with CFS before submitting her LTD claim, and CNA has presented no evidence creating a fact issue concerning the accuracy of that diagnosis. Notwithstanding CNA's counsel's repeated (and rather insensitive) characterization of CFS as a "garbage can diagnosis,"[17] *see* Doc. 30 at 11, 14 & 17, the disease is "universally recognized as a severe disability."   *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 443 (3rd Cir. 1997)). Further, it is entirely consistent with the eventual diagnosis of CFS that Pharr visited a number of specialists and that those physicians were initially unable to identify the nature of Pharr's

_____

[17]Similarly unprofessional are CNA's counsel's flippant remarks concerning Dr. Cheney's recommendation that Pharr take garlic (among other things) for her CFS.  In that regard, the insurer's summary judgment opposition memorandum states: "Garlic, of course, is the 'nationally recognized' treatment for vampires.  So, one can only opine that garlic is now also the 'nationally recognized' treatment for CFIDS."  Doc. 30 at 17.

illness despite ordering a battery of tests.  Such an experience is typical of the "rule-out" process

customarily involved in reaching a CFS diagnosis.  In other words:

> "[B]ecause chronic fatigue syndrome is diagnosed partially
> through a process of elimination, an extended medical history of
> 'nothing-wrong' diagnoses is not unusual for a patient who is
> ultimately found to be suffering from the disease. . . . [I]n a
> purely linguistic sense, an early report that 'I am unable to find
> the cause' does not contradict a later report that 'I have now
> found the cause.'  The statements together demonstrate an
> evolution rather than a contradiction."

*Mitchell*, 113 F.3d at 442 (quoting *Sisco v. U.S. Dept. of Health & Human Servs.*, 10 F.3d 739,

745 (10th Cir. 1993)).  Even CNA admits that CFS and fibromyalgia "refuse to reveal

themselves to any known form of laboratory, radiological, neurological, or psychiactric [sic]

tests.  By there [sic] very nature, they are only diagnosed when all other possible known

physical, neurological and psychological disorders are rejected."  Doc. 30 at 11.  Moreover, it

is unnecessary for Pharr to present "objective" medical evidence confirming her CFS diagnosis

and the severity of her symptoms.  *See Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11

*21 (1st Cir. 2003) (stating it was not reasonable for insurer to expect claimant to provide

convincing "clinical objective" evidence that she was suffering from CFS); *Mitchell*, 113 F.3d

at 442-43 (holding it was arbitrary and capricious to require a claimant seeking LTD benefits

based on CFS to submit "objective medical evidence" of disability).[18]   The 1993 version of

policy SR-83086814 contains no such requirement.[19]

---

[18]Nevertheless, the Court finds such objective medical evidence does exist.  *See, e.g.,* Dr.
Cheney's December 16, 1998 "To Whom It May Concern" letter (CNA0652) (initially diagnosing
Pharr with CFS); Dr. Cheney's February 16, 1999 memorandum (CNA0204) (reporting abnormal
laboratory findings); Dr. Cheney's July 12, 1999 report (CNA0471) (reporting results of
cardiopulmonary exercise stress test); and Dr. Cheney's October 18, 2000 report (attached as Exhibit
2 to Doc. 28) (summarizing objective findings).

[19]In contrast, the 1999 version of the policy does contain "objective medical findings"
language.  In a section entitled "Proof of Disability," the 1999 policy states that the covered
employee's proof of loss must include, *inter alia,* "[o]bjective medical findings which support Your
Disability."  CNA0016.  The policy further states: "Objective medical findings include but are not
limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine,
for Your disabling condition(s)."  *Id.*  However, Pharr's proof of loss was submitted before the 1999
policy took effect.  Hence, Pharr complied with the requirements of the policy in effect at the time she
presented her claim.  CNA does not contend otherwise.  In none of its summary judgment submissions
does the insurer assert that the "objective medical findings" provision in the 1999 policy controls.
Pharr has consistently relied on the 1993 version of the policy in arguing that the policy contains no
objective medical evidence requirement.  *See* Doc. 25 at 11-12.  In response, CNA has taken great
pains to suggest that it never actually subjected Pharr to an objective medical evidence standard.  In
that regard, the insurer's summary judgment opposition memorandum states, in pertinent part:

> [B]ecause [CNA conducted a factual evaluation and review of Pharr's
> "physical impairment," Pharr] suggests that [CNA] has impermissibly
> gone beyond the language in the policy.  Specifically, [Pharr] suggests
> that [CNA] has "added" terms to the policy that require "objective"
> medical evidence prior to the award of any disability benefits.

> If [Pharr's] argument were taken as true, no administrator could ever
> "label" appropriately its "doubts" over a disability claim, without being
> accused of "going beyond the contract" or "adding terms to the policy."
> In fact, taken to its logical conclusion, under [Pharr's] argument, an
> administrator must solely follow a narrow tunnel, or "pre-determined"
> path provided to it by [a plaintiff], in the form of limited submissions,
> records and information that suggest only one outcome to the benefits
> determination.  In essence, the administrator would then be required to
> blindly issue a subsequent "rubber stamp" approval for benefits, lest it
> mislabel what it seeks with the word "objective."

The Court turns now to Pharr's occupational requirements and her physical and cognitive capacity to meet those requirements. The position description TMA furnished CNA with Pharr's initial claim package described the job duties of an "Associate Media Director" in very general terms. CNA0645. However, it is undisputed that beyond those general duties, Pharr also managed TMA's Dallas branch office. To ensure that CNA was fully aware of that fact, TMA's LTD Employer's Statement accompanying Pharr's initial claim submission expressly stated: "Job description attached - In addition to managing the media planning and buying group for a large client, this position also manages our branch office in Dallas. Requires a great deal of client and vendor contact (face-to-face)." CNA0644. Additionally, on April 1, 1999, TMA provided further information concerning Pharr's job in a follow-up letter to CNA. CNA0642. On this subject, the April 1st letter informed CNA that Pharr "was in charge of the entire media planning and buying operation for one of [TMA's] largest accounts - a $60 million dollar financial services account with operations and advertising needs covering 12 states;" that "media plans for placement of newspaper, radio, and television ads often have to be developed and revised on very short notice and with immediate deadlines, making this a 'high stress' account;" that Pharr "managed a staff of six people in Dallas as well as working directly with the account management team . . . in Richmond and the client in Columbus, Ohio;" that Pharr

Doc. 30 at 11-12. Similarly, a few pages later, CNA states: "[W]hat [CNA] labeled as 'objective' was simply a desire to find a disabling condition based on something more than a 'garbage can' diagnosis." *Id.* at 14. These arguments make clear that CNA is not relying on the "objective medical findings" provision in the 1999 version of the policy. Under these circumstances, and given the fact that CNA has admitted that the definition of disability contained in the1993 version of the policy controls, the Court determines that Pharr's claim was not subject to an "objective medical findings" requirement.

"normally spent about 30% of her time traveling to Richmond, Columbus, and the various market areas;" that Pharr's job required a minimum 9-hour average work day; and that "[t]he demands of the job reflect[ed] the nature and requirements of the client, so [TMA] d[id] not feel that the job could be modified by reducing hours or travel requirements." *Id.*

There is nothing in the record disputing these characterizations of Pharr's job functions and responsibilities. Further, there is absolutely no indication from the record that these described duties deviated in any way from the general "occupation" of a combined Vice President/Associate Media Director and branch manager for any national advertising agency.

Thus, Pharr's occupation was no "desk job;" it cannot properly be characterized as sedentary. Under Social Security regulations, "sedentary work" is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). The fact that Pharr's position required such extensive travel removes it from the category of sedentary work. *See Cunningham v. Paul Revere Life Ins. Co.,* 235 F. Supp. 2d 746, 755 (W.D. Mich. 2002) (rejecting insurer's characterization of claimant's occupation as Vice President of Sales and Marketing as sedentary where the record reflected, *inter alia,* that "a third of Plaintiff's job involved domestic and international travel, and that some lifting is necessarily required to accommodate the ability to travel and to meet with clients, customers, and vendors"); *Paese v. Hartford Life & Acc. Ins. Co.,* 2004 WL 764760 *9 & n.7

(S.D.N.Y. 2004) (rejecting argument that occupation of labor relations manager was sedentary and finding that claimant was totally disabled, in part because job required "extensive traveling, including on plane trips throughout the United States and Europe (which undoubtedly required him to carry luggage)"); *Dorsey v. Provident Life & Acc. Ins. Co.,* 167 F. Supp. 2d 846, 855-56 (E.D. Pa. 2001) (holding that insurer's decision to deny ERISA benefits under "own occupation" LTD policy was arbitrary and capricious where, *inter alia,* insurer's vocational consultant never addressed the fact that the claimant's job required traveling).

Moreover, it is quite evident that Pharr's position required a significant level of cognitive ability. It was necessary for Pharr to engage in complex and multi-level decision-making, to multi-task, to prioritize, to prepare and deliver presentations to a sophisticated business client, and, in general, to ensure that TMA satisfied that important client's advertising needs. This all took place in a "high-stress" atmosphere at the corporate officer level.

It is ludicrous to suggest that Pharr had the ability to carry out her occupational responsibilities while experiencing the symptoms and attendant functional limitations caused by her CFS. In that regard, Dr. Cheney's initial Physician's Statement listed the following physical limitations for Pharr: no lifting greater than 10 pounds, no standing longer than 30 minutes, no stooping, and "reduced physical stress." CNA0651. Given these restrictions, there is no way in the world Pharr could have carried out the substantial and material duties of her occupation.

As previously noted, Dr. Truchelut's May 13, 1999 report to CNA references "a detailed Statement of Daily Activities filled out by the claimant on 4/2/99," in which Pharr "describes

'good days and bad days' but at least part of the time cooks meals, does her own laundry, handles her own money and pays bills, shops for groceries, drives a car, and exercises, mostly with Yoga." CNA0067.  However, the Statement of Daily Activities is absent from the administrative record CNA filed with the Court.  Accordingly, on April 27, 2004, the Court entered an Order (Doc. 44) requiring CNA to file a copy of the Statement.  CNA responded by stating that it cannot find the document. *See* Doc. 45.  Hence, CNA's prior representation to this Court, that the administrative file attached as Tab 3 to its summary judgment motion constitutes "the complete Administrative Record reviewed by CONTINENTAL CASUALTY in its determination of Plaintiff's claim for long-term disability benefits," Doc. 26, ¶ 15, at 3, is inaccurate.  More fundamentally, this deprives the Court of a critical document bearing on the question of Pharr's functional capacity.[20]  Although Dr. Truchelut's report addressed activities Pharr stated she sometimes could do, equally significant would be the things she reportedly couldn't do.  Without the missing Statement, the Court obviously is unable to determine what Pharr disclosed in that regard.  In any event, even if Pharr *sometimes* had the ability to conduct the basic activities mentioned in Dr. Truchelut's report, that hardly translates into the capacity

---

[20]Obviously, CNA also viewed the missing Statement of Daily Activities (which the company alternatively refers to as an "ADL") as critical.  In its initial claim denial letter, CNA stated:  "Based on all of the above information, *plus the ADL which you completed on 4/2/99,* there is no objective medical evidence to support a condition with the severity to prevent you from doing the material and substantial duties of your own occupation."  CNA0061 (emphasis added).  Additionally, in CNA's final letter notifying Pharr's attorney that the company was denying Pharr's appeal, CNA stated:  "Further, if medical evidence and/or *reported activities of daily living* reflect a physical capability that is equal to or greater than that which is required to perform the substantial duties of an occupation, then the definition of disability would be rendered not met."  CNA0049 (emphasis added).

to engage in a demanding, high-stress ad agency corporate position involving significant

cognitive requirements and substantial travel.

Pharr's inability to carry on her occupation is poignantly illustrated by an October 16,

2000 letter authored by Diane Baar.[21]   Senior Vice President/Media Director at TMA, Baar

directly supervised Pharr during the period 1993 to 2000.  The letter begins by discussing what

a valued employee Pharr was.  It then states:

> In March 1998, Gaylyn became ill with a very bad case of the flu
> (we thought).  It soon became apparent, however, that her health
> issues were greater.  She began months of doctor visits and
> extensive medical testing.  She was absolutely determined to
> fight the illness while continuing to handle all media
> responsibilities for the Bank One account.
>
> Her physical and cognitive weaknesses were becoming
> increasingly evident and by May, 1998, I saw Gaylyn struggle
> with the extreme demands of her position while trying to deal
> with the profound fatigue and cognitive problems she faced
> daily.   I watched, first hand, while my dependable,
> knowledgeable and well-spoken employee deteriorated in
> thought processes, word search, memory problems and decision
> making, her previous strengths.  As she became increasingly
> disoriented and exhausted after air travel (a necessity for her
> position), TMA arranged for Gaylyn to arrive one day in advance
> so she could rest prior to client or TMA meetings. I began flying
> to the Dallas office and client meetings to assist her when her
> planning skills, reasoning, and presentation skills decreased to
> the point of forgetting, mid-sentence, what she was trying to
> explain or present.   She became unable to make simple
> decisions, run meetings, carry on conversations without word

---

[21]Since the initial step of heightened arbitrary and capricious review involves *de novo*
consideration, the Court may properly consider this additional evidence. *See Kirwan*, 10 F.3d at 789.
However, even if the Court were confined at this stage to considering the record before CNA at the
time of the company's decision, it would still conclude as a matter of law that CNA's decision was
wrong.

search problems, handle multiple tasks at once, or use multi-function thinking without my support.

Gaylyn was totally devoted to this company and constantly worked for the good of both the client and the agency. Her performance externally with clients and media reps and internally with peers and superiors was beyond reproach. TMA's Chairman of the Board, TMA's executive committee, and Bank One executive staff consistently recognized Gaylyn's work ethic and abilities.

Toward the end of her employment with TMA, she used the same determination, loyalty, dependability, drive, and goal-oriented attributes that secured three major promotions, including Vice President, for her during her six-year tenure to fight the disease and its devastating effects. Finally, upon the strong recommendations of her doctors and encouragement by TMA, she regretfully left her position in January, 1999 to fight the disease. I supported her departure and remain in regular contact with her. In my opinion, she is currently unable to work in any position, but she will always remain a welcomed employee to TMA if, and when, her health returns.

Doc. 25, Exhibit "B;" Doc. 37, attached Pharr Affidavit, Exhibit "A."[22]

Pharr's inability to perform the duties of her occupation is further confirmed by a report

Dr. Cheney prepared on October 18, 2000. Therein, Dr. Cheney recounted Pharr's medical

history, listed the objective findings supporting his diagnosis of CFS, and closed by stating:

[M]y professional opinion of Gaylyn Pharr regarding her diagnosis of chronic fatigue syndrome is based on objective tests and physical findings which are supported by the peer-reviewed medical literature on chronic fatigue syndrome. It is my further opinion, within a reasonable degree of medical certainty, that Gaylyn Pharr is also disabled with this syndrome and cannot

---

[22]The second page of Baar's letter was inadvertently omitted from the copy attached as Exhibit "B" to Doc. 25. Both pages of the letter are attached as Exhibit "A" to Pharr's affidavit appended to Doc. 37.

sustain meaningful employment in the national economy.  *She has been fully disabled since December of 1998.*

Doc. 28, Exhibit 2, at 3 (emphasis supplied).

Finally, it is also noteworthy that in December 2000, a Social Security Administration Administrative Law Judge concluded that Pharr could not perform her "past relevant work," stating: "The claimant's past work in the advertising industry was skilled.  Since she is now limited to the performance of no more than unskilled work activity, she is unable to perform her past relevant work."  Doc. 24, Exhibit A2, "Decision," at 6.[23]  The Social Security Administration's determination in this regard is something this Court may properly consider in reviewing an ERISA administrator's denial of benefits.  *See Kirwan v. Marriott Corp.,* 10 F.3d 784, 790 & n.32 (11th Cir. 1994) ("A district court may consider the Social Security Administration's determination of disability in reviewing a plan administrator's determination of benefits"); *Whatley v. CNA Ins. Companies,* 189 F.3d 1310, 1314 & n.8 (11th Cir. 1999) (quoting *Kirwan*).

Based on the foregoing, this Court determines that the record conclusively demonstrates that Pharr met the LTD policy's definition of total disability at all relevant times.

---

[23]The ALJ determined that Pharr was not disabled under Social Security Administration requirements through the date of the decision (December 14, 2000) because Pharr had the residual functional capacity to perform a significant range of light work. Subsequently, the agency determined that Pharr became disabled under its rules on December 15, 2000 and awarded her disability benefits commencing June 2001. *See* Doc. 24, Exhibit "A."

## B. Was CNA's Decision Reasonable?[24]

In short, no. No reasonable fact-finder could conclude that CNA's benefit denial decision was reasonable.

It was improper for CNA to require "objective" medical evidence confirming Pharr's CFS diagnosis and the severity of her symptoms. *See Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11 *21 (1st Cir. 2003) (stating it was not reasonable for insurer to expect claimant to provide convincing "clinical objective" evidence that she was suffering from CFS); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-43 (3rd Cir. 1997) (holding it was arbitrary and capricious to require an LTD claimant with CFS to submit "objective medical evidence" of disability).[25] It was also unreasonable for CNA to (1) disregard the "rule-out" nature of diagnosing CFS; (2) characterize Pharr's position as sedentary, given the extensive travel and other demands of the job, (3) virtually ignore Pharr's cognitive limitations, and (4) completely ignore the results of the cardiopulmonary exercise stress test Pharr underwent before CNA rendered its final decision.

For these reasons, the Court concludes that CNA's benefits denial decision was unreasonable as a matter of law.

---

[24]At this second step, the Court considers only evidence that was before CNA at the time the insurer denied Pharr benefits.

[25]However, as previously noted, *see* n.18 *supra*, such objective medical evidence did exist.

**C. Did CNA's Decision Benefit the Class of all Participants and Beneficiaries?**

Even if CNA's decision was not unreasonable as a matter of law (or, alternatively, if a fact issue existed concerning reasonableness), Pharr would nevertheless be entitled to summary judgment. This is because the record is devoid of any evidence that CNA's decision on Pharr's LTD claim benefitted the class of all participants and beneficiaries. In fact, CNA has not even bothered to address this issue in its summary judgment submissions or in its trial brief.

## VI. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. Defendant Continental Casualty Company's Motion for Summary Judgment (Doc. 26), filed February 17, 2004, is DENIED.

2. Plaintiff Gaylyn Pharr's Dispositive Motion for Summary Judgment (Doc. 23), filed February 17, 2004, is GRANTED.

3. The Court will defer entry of final judgment to afford counsel an opportunity to attempt to agree on the amount to be awarded to Plaintiff under the LTD policy. The attorneys shall promptly confer on that issue. Within eleven (11) days, counsel shall file either an agreed statement concerning appropriate relief or a statement identifying the areas of disagreement and the bases therefor. Any claim for attorneys' fees may be asserted by separate motion timely filed in accordance with Local Rule 4.18.

4. Defendant's Amended Motion In Limine (Doc. 33), filed March 8, 2004, is DENIED. Since the first step in heightened arbitrary and capricious review is to determine whether the administrator's decision was wrong from the perspective of *de novo* review, this Court may

consider matters outside the administrative record. *See Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994).

5.   Plaintiff's Second Request for Leave to File Her Affidavit to Refute Defendant's Allegations in its Opposition Memorandum That is Not Based [on] or Supported by the Administrative Record (Doc. 37), filed March 22, 2004, is GRANTED.   Pharr's affidavit and the attached document shall be deemed a part of the summary judgment record.

6.   The parties' Joint Pretrial Statement (Doc. 39) is deficient in a number of respects. The document does not contain a statement of Plaintiff's damages, Plaintiff's exhibit list is not on the Clerk's required form, Defendant's objections do not appear on Plaintiff's exhibit list, exhibits on both parties' lists are insufficiently described (e.g., "Administrative Record CNA0038-652"), and both sides have improperly attempted to "reserve" the right to amend their exhibit and witness lists and to call unspecified witnesses.   Counsel should re-read pp. 5-7 of the Case Management and Scheduling Order (Doc. 14) and Local Rule 3.06 in order to ascertain the specific requirements they have violated.   The Court expects better of counsel in the future.

7.   This case is removed from the June 2004 trial calendar.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida this ___13th___ day of May, 2004.

Anne C. Conway
ANNE C. CONWAY
United States District Judge

-30-

Copies furnished to:

Counsel of Record
Unrepresented Party
Administrative Law Clerk

F I L E   C O P Y

Date Printed: 05/12/2004


Notice sent to:

      ____  Carrie J. Feit, Esq.
            Wagar Murray & Feit PA
            3250 Mary St., Suite 302
            Coconut Grove, FL  33133

            6:03-cv-00735   maa

      ____  Gregory Paul McMahon, Esq.
            Marcus, McMahon & Myers, PL
            The Citrus Center, Suite 1250
            255 South Orange Ave.
            Orlando, FL 32801

            6:03-cv-00735   maa